Robert DILL, Jr., Susan Dill, Lauren Dill, Leslie Borland, Jr., Judith Borland, and John Mullins, as individuals, and on behalf of a class of individuals, similarly situated,[1] Plaintiffs,

v.

LAKE PLEASANT CENTRAL SCHOOL DISTRICT, Board of Education of the Lake Pleasant Central School District, and Board of Registration of the Lake Pleasant School District, Defendants.

No. 5:99–CV–1610(FJS/GJD).

United States District Court, N.D. New York.

June 5, 2002.

---

1. Although Plaintiffs filed this action as a purported class action, they have never moved for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

Hancock & Estabrook, LLP, Syracuse, NY, Alan J. Pierce, of counsel, for Plaintiffs.

Ruberti, Girvin & Ferlazzo, P.C., Albany, NY, Gregg T. Johnson, Tanya A. Yatsco, of counsel, for Defendants.

### MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief Judge.

### I. INTRODUCTION

Plaintiffs commenced this action on October 5, 1999, pursuant to 42 U.S.C. § 1983, alleging that Defendants had violated their constitutional rights to equal protection and due process of law by denying them the right to vote at the budget vote and school board election on May 18, 1999, and in a special referendum regarding the construction of a new school on June 2, 1999, on the ground that they were not residents of the Lake Pleasant Central School District (the "District") because they maintained another residence outside the District.

Plaintiff's complaint contains three causes of action. The first seeks damages of $100 per Plaintiff as a result of Defendants' violation of their rights to equal protection and due process of law. The second cause of action seeks a declaration "of their rights and the Defendants' duties, and such a judicial declaration is necessary as to Plaintiffs' rights and Defendants' duties and obligations regarding Plaintiffs' eligibility and right to vote in any and all elections held in the Lake Pleasant Central School District." *See* Complaint at ¶ 86. Finally, Plaintiffs' third cause of action seeks judgment permanently enjoining and restraining Defendants from prohibiting them from exercising their right to vote in all District elections.

Presently before the Court are Defendants' motion for summary judgment and Plaintiffs' motion for partial summary judgment.[2] The Court heard oral argument in support of, and in opposition to, these motions on August 7, 2001. At that time, the Court ruled from the bench, dismissing as moot the second and third causes of action of all Plaintiffs except for John Mullens. The Court reserved decision on Plaintiffs' first cause of action. The following constitutes the Court's written decision with respect to that cause of action.

## II. BACKGROUND

Lake Pleasant Central School District is located in a small community in the Adirondacks. District elections are usually held in May. Prior to May 1998, few, if any, of the "summer landowners" ever attempted to vote in District elections. Pre–1999 District elections used the "poll regis-

tration" system whereby voters were not required to preregister before the vote and no voting machines were used. Before May 1998, approximately twenty to forty people usually voted in District elections.

In May 1998, hundreds of people showed up to vote. This situation, in addition to the requests for absentee ballots and other factors, led the Board of Education to adopt a system of personal registration in July 1998. Under that system, the District was required to create the Board of Registration, which was charged with creating and maintaining the District's voter registration books.

Following the adoption of personal registration, the Board of Registration obtained from the Hamilton County Board of Elections a list of voters the County Board believed to be qualified to vote in the District. The Board of Registration used this list as the starting point for the District's voter registration books. However, in reviewing that list, the Board of Registration discovered numerous inaccuracies, including the names of deceased individuals and people who had moved out of the District several years ago. Since it began to doubt the reliability of the County Board of Elections' list, the Board of Registration began to look for another way to determine residency for purposes of defining eligibility to vote in District elections.

In doing so, the Board of Registration decided to look at whether a potential voter had designated a home within the District as his "primary residence" on his New York School Tax Relief ("STAR") exemption application. If such a designation was made, this designation was considered as a significant factor in determin-

2. Specifically, Plaintiffs seek an order establishing that all of them were entitled to vote in the May 18, 1999, June 2, 1999, and May 16, 2000 elections and that, additionally, Plaintiff Mullens was entitled to vote in the March 28, 2001 and May 15, 2001 elections and in all future elections. In addition, Plaintiffs seek an order enjoining Defendants from further preventing Plaintiff Mullens from voting.

ing that the individual was a resident of the District and, thereby, eligible to vote in District elections. On the other hand, if the potential voter designated a home outside the District as his primary residence for STAR purposes, the Board of Registration considered this strong evidence that the individual was not a resident of the District.

Plaintiffs challenge the Board of Registration's reliance upon the STAR exemption as evidence of residency for voting purposes. In addition, they challenge the manner in which the Board of Registration applied the criteria upon which it relied to determine residency to Plaintiffs as opposed to other individuals who sought to vote in District elections.

## III. DISCUSSION

### A. Subject matter jurisdiction

■ As a preliminary matter, Defendants have raised the issue of whether this Court has subject matter jurisdiction over Plaintiffs' claims. According to Defendants, to the extent that Plaintiffs are challenging the Board of Registration's actions of investigating residency, removing non-residents' names from the District's voter registration books, or are otherwise claiming that Defendants did not act in compliance with the Education Law, Plaintiffs should have brought these claims before the Commissioner of Education. *See* Defendants' Memorandum of Law at 23 (citing N.Y. Educ. L. § 2037; *Schulz v. State,* 86 N.Y.2d 225, 231, 630 N.Y.S.2d 978, 654 N.E.2d 1226 (1995)). Moreover, Defendants contend that merely phrasing the alleged wrongdoing in terms of a constitutional violation does not obviate the need for first raising the claims with the

Commissioner of Education. *See id.* at 24 (citing *Schulz,* 86 N.Y.2d at 232, 630 N.Y.S.2d 978, 654 N.E.2d 1226; *Finch, Pruyn & Co. v. Kearns,* 282 A.D.2d 858, 722 N.Y.S.2d 838 (3d Dep't 2001)). Nor, according to Defendants, does a claim fall outside the Commissioner's jurisdiction simply because it involves the construction or application of a statute. *See id.* (citing *Schulz v. Galgano,* 224 A.D.2d 535, 637 N.Y.S.2d 797, 798 (2d Dep't 1996)). Based upon these principles, Defendants argue that the Court should decline to exercise its subject matter jurisdiction over Plaintiffs' claims to the extent those claims raise issues of election irregularities and Education Law violations. *See id.*

■ Section 2037 of New York Education Law provides, in pertinent part, that

[a]ll disputes concerning the validity of any district ... election or of any of the acts of the officers of such ... election shall be referred to the commissioner of education for determination and his decisions in the matter shall be final and not subject to review. The commissioner may in his discretion order a new ... election.

N.Y. Educ. Law § 2037 (McKinney 2000).[3]

In the present case, Plaintiffs do not challenge the validity of the elections in which they were denied the right to vote. Nor do they seek to have the Court declare those elections invalid and require new elections. They do not even claim that had they been permitted to vote, the elections would have turned out differently. Had they requested those types of relief, there would be little doubt that under § 2037, the Commissioner of Edu-

---

**3.** Although § 2037 provides that the Commissioner's decision is final, case law indicates that a petitioner may appeal an adverse decision of the Commissioner to a court for a determination of whether the Commissioner's actions were arbitrary or without rational basis. *Cf. Application of Colson,* 285 A.D. 797, 798, 140 N.Y.S.2d 837 (3d Dep't 1955).

cation would have had exclusive jurisdiction over their claims. Instead, Plaintiffs contend that Defendants' actions in singling Plaintiffs out for investigation of their status as residents and Defendants' reliance upon Plaintiffs' STAR exemptions on property they owned outside the District to determine that Plaintiffs were not residents violated their rights to due process and equal protection.

Although such claims arguably question the validity of the acts of the officers conducting the elections, which is within the purview of § 2037, and, thus, subject to the Commissioner's jurisdiction, the Court finds that the relief that Plaintiffs seek—particularly the monetary damages for their first cause of action—is not within the Commissioner's power to grant. In *Primps v. Bd. of Educ., Union Free Sch. Dist. No. 1 of Town of Ossining*, 63 Misc.2d 931, 314 N.Y.S.2d 106 (1970), an Article 78 proceeding, the petitioner sought an order in the form of mandamus to compel the board of education to allow him and others similarly situated to exercise their lawful right to vote on a school budget. The court found that it had jurisdiction over this claim despite the administrative remedy provided in § 2037, noting that "a body of deciaional [sic] law has grown up through the years which preserves to the Courts their proper power to adjudicate issues which are entirely legal." *Id.* at 933, 314 N.Y.S.2d 106. The court explained that

> "where the right of a party depends upon the interpretation of a statute and it is claimed that a school board or official has proceeded to act in violation of an express statute, and thereby the party complaining is being deprived of valuable rights, the courts will not be ousted of jurisdiction to determine the matter, notwithstanding another method of set-

tling the controversy has been provided."

*Id.* (quotation omitted).

In the present case, although Plaintiffs' claim is not specifically a statutory claim, part of the claim does depend upon the interpretation of the meaning of the term "primary residence" for purposes of a STAR exemption, as well as the meaning of "resident" for purposes of the Education Law, in determining whether an individual is eligible to vote in District elections. Moreover, the remedy they seek, at least in their first cause of action, is legal, not equitable. Accordingly, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims.

## B. Summary judgment standard

Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this burden, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505 (quotation and footnote omitted); *see* Fed. R.Civ.P. 56(e) ("an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, . . ."). To meet this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). "Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment." *Fincher v. County of Westchester*, 979 F.Supp. 989, 995 (S.D.N.Y.1997) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990)). The Court, however, must not weigh the evidence but instead is "required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments[.]" *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.1996) (citations omitted).

### C. Plaintiffs' residency

#### 1. In May and June 1999 and in May 2000

It is well-established that only qualified voters have a right to vote. *See Reynolds v. Sims*, 377 U.S. 533, 554–55, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 36 n. 78, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Moreover, the Supreme Court has made clear that while citizens may have a right to vote, that right may constitutionally be predicated on meeting reasonable voter qualifications such as residency. *See Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 625–26, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Carrington v. Rash*, 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

In New York, § 2012 of New York Education Law provides that a person is entitled to vote in a school district election if he (1) is a citizen of the United States, (2) is eighteen years of age, and (3) is a resident within the district for the thirty days immediately preceding the election at which he desires to vote. *See* N.Y. Educ. Law § 2012 (McKinney 2000). The statute itself does not define "resident" or "residence;" nor does it provide any criteria for determining whether a particular person is a resident. However, courts construing the term "residence" have held that "[a] person may have only one legal residence or domicile, and that is the place where such a person intends to have his or her permanent residence or home." *Appeal of Taylor*, 39 Educ. Dep't Rep. —— (Decision No. 14,357, May 8, 2000) (citing *Appeal of Kuleszo*, 30 Ed Dept Rep 465, Decision No. 12,537; Op Atty Gen, 1934, 51 St Dept Rep 123; *Matter of the Appeal of Nelson Beck*, 74 St. Dept Rep 78).[4] The Commissioner in *Taylor* also stated, in dicta, that "[d]ual home ownership does not confer upon the property owner the right to designate residency for the purpose of participating in school district elections. Rather, residency is dependent on the intent and conduct of the owner." *Id.* (citing Op. Atty. Gen., 1932, 45 St. 128).

Although the Education Law does not include any criteria for determining residency, New York Election Law does. Section 5–104 of New York Election Law provides, in pertinent part, that

[i]n determining a voter's qualification to register and vote, the board to which such application is made shall consider, in addition to the applicant's expressed intent, his conduct and all attendant surrounding circumstances relating thereto. The board taking such registration may consider the applicant's financial independence, business pursuits, employment, income sources, residence for in-

---

**4.** The *Taylor* case is particularly significant because it involves the very same elections as those at issue here.

come tax purposes, age, marital status, residence of parents, spouse and children, if any, leaseholds, sites of personal and real property owned by the applicant, motor vehicle and other personal property registration, and other factors that it may reasonably deem necessary to determine the qualification of an applicant to vote . . .

N.Y. Elec. Law § 5–104(2) (McKinney 1998).

■ The issue in this case is whether Plaintiffs were "residents" of the District for the thirty days immediately preceding the May 18, 1999, June 2, 1999, and May 16, 2000 District elections.[5] Defendants assert that Plaintiffs were not residents of the District at that time because their conduct failed to evince an intent to establish legal residency in the District.[6] To support their argument, Plaintiffs point to the following information:

**Plaintiff John Mullens:** According to Defendants, the following evidence establishes that Mullens' conduct evinces an intent to make Clifton Park, which is outside the District, his residence: (1) his May 1999 absentee ballot application states that he resides in Clifton Park, (2) he spends between 205 and 240 days per year outside the District, (3) he applied for

and received a STAR exemption on his Clifton Park property each and every year since 1999, despite the fact that his Lake Pleasant property has a higher market value, (4) each and every one of the New York State tax returns he filed since 1995 states that Clifton Park is his permanent home address, (5) he maintains a home office in Clifton Park and his business cards list his Clifton Park address, (6) the majority of his mail, as well as his *Hamilton County News* newspaper subscription, is delivered to Clifton Park, and (7) his primary care physician is not located in the District.

**Plaintiffs Robert, Susan and Lauren Dill:** According to Defendants, the following evidence establishes that the Dills' conduct evinces an intent to make Mount Kisko, which is outside the District, their residence: (1) the Dills owned and occupied a condominium in Mount Kisko from April 1988 through March 2000, at which Robert Dill maintained a home office and from which the Dills filed their income tax returns through tax year 1998, (2) Robert and Susan Dill's joint state income tax returns for 1995–1998 indicate that Mount Kisco was their permanent home address, (3) until late May 1999, Susan Dill's driver's license listed her Mount Kisco ad-

---

**5.** In the case of Plaintiff Mullins, there is also an issue as to whether he was a resident of the District for the thirty days immediately preceding the March 28 and May 15, 2001 District elections.

**6.** In 2001, the circumstances of five of the six Plaintiffs changed. The Dills sent a letter to the Board of Registration, stating that they now had a STAR exemption on their property in Lake Pleasant. In response to that letter, the Board of Registration confirmed with the Lake Pleasant assessor that the Dills, in fact, obtained a STAR exemption on their Lake Pleasant property. The Board of Registration then determined that the Dills had provided proof of residency in the District and reinstated them to the District's voter registration

books. Similarly, the Borlands provided the Board of Registration with a copy of their school tax bill indicating that they had a STAR exemption on their Lake Pleasant property for the fiscal year July 1, 2000 through June 30, 2001. Thereafter, the Board of Registration reinstated the Borlands to the District's voter registration books. Since they were reinstated, Robert Dill, Susan Dill, Leslie Borland, Jr., and Judith Borland cast absentee ballots in the March 28, 2001 District referendum related to the new school building. Lauren Dill received an absentee ballot but did not correctly complete it. She is, however, currently a qualified voter in the District.

dress—at which time she changed it in response to the challenge of her May 18, 1999 vote, (4) the Dill children both attended public school in the Chappaqua Central School District until 1997 and 1999 respectively, (5) the Dills had cable TV service in Mount Kisco but not in Lake Pleasant, and (6) the Dills applied for and received a STAR exemption on their Mount Kisco property in both 1998 and 1999.

**Plaintiffs Leslie and Judith Borland:** According to Defendants, the following evidence establishes that Leslie and Judith Borland's conduct evinces an intent to make Lake Placid, which is outside the District, their residence: (1) Judith Borland completed a STAR application for her marital home, certifying that her primary residence was Lake Placid, (2) Judith Borland applied for and received an Alternative Veterans Exemption from Real Property Taxation on her Lake Placid property, stating that Lake Placid was the primary residence of veteran Leslie Borland, (3) prior to July 1, 1999, the Borlands spent approximately 325 days per year outside the District, (4) Leslie Borland is the owner of a company located in Lake Placid and Judith Borland is the office manager of that company, (5) the Borlands' primary care physicians are not located in the District, (6) the Borlands received the majority of their mail in Lake Placid and have been members of a church in Lake Placid since 1998, and (7) from May 1999 to the present, all of the Borlands' vehicles, with the exception of one which was sold or removed from the policy before September 12, 2000, are listed on their insurance declaration forms as being "principally garaged" in Lake Placid.[7]

7. In their Reply Memorandum of Law, Defendants assert that after the Dills' qualifications were challenged in May 1999, the Board of Registration sent them a request for documentation of their residency. Lauren Dill did not respond. Robert and Susan Dill submitted the following documentation: a copy of one vehicle registration with an address in the District, copies of their Hamilton County Board of Election cards, Susan Dill's pistol permit with an address in the District, Robert Dill's driver's license with an address in the District, and Susan Dill's driver's license with an address outside the District. The Dills admitted that they filed their tax returns from Mount Kisco.

Similarly, on May 17, 2000, following the challenge of the Dills' affidavit ballots, the Board of Registration sent a letter to the Dills requesting that they provide the Board of Registration with proof the their residency in the District by May 23, 2000. Since the Dills did not submit any information to the Board of Registration before the May 23, 2000 deadline, the challenges were sustained.

After the Borlands' qualifications to vote were challenged at the June 2, 1999 election, the Board of Registration sent them a request for documentation of their residency. In response, the Borlands sent the following documentation: a copy of a notification from the Hamilton County Board of Elections that their voter enrollment had been approved and a copy of their drivers' licenses with a Lake Placid address scratched out and a Lake Pleasant address hand-written in. They also provided a copy of a letter to the Lake Placid and Lake Pleasant Assessors regarding their desire to change their STAR and Alternative Veterans' tax exemptions for the year 2000. There was also information that as of May 5, 1999, Judith Borland's STAR and Alternative Veterans' tax exemptions were on her Lake Placid property.

On May 17, 2000, following the challenge to the Borlands' affidavit ballots, the Board of Registration sent a letter to the Borlands requesting that they provide the Board of Registration with proof of their residency in the District by May 23, 2000. In response, the Borlands mailed a derogatory and sarcastic letter and provided a copy of the same Hamilton County Board of Elections notice they had previously submitted. Accordingly, the challenges to their ballots were sustained.

John Mullens never submitted any information to the Board of Registration to establish his residency in the District. The only information available to the Board of Registration when it made its determination relative to Mr. Mullens' absentee ballot application and affi-

Plaintiffs do not dispute any of these facts. However, they characterize them as "minor" items. Furthermore, they argue that the "primary residence" certification on the STAR application does not equate "primary residence" with "residence" for voting purposes. *See* Plaintiffs' Memorandum of Law at 7. Thus, Plaintiffs assert that

> [w]hen the Court compares the minor items relied on by Defendants with the over 20 year continuous voter registration of the Dills and John Mullens in Hamilton County, and the good faith change of voter registration and residence by the Borlands in February/March 1999 as evidenced by their conduct, and the Hamilton County Board of Elections' rejection of Defendants' challenge to the voter registration of John Mullens, there can be only one conclusion as a matter of law with respect to whether Plaintiffs were residents of the District in May 1999 and therefore qualified to vote. The only conclusion that this Court could reach as a matter of law ... is that Plaintiffs were residents of the District and were qualified to vote in May 1999.

*See id.*[8]

### 2. *Plaintiff Mullens' present residence*

Plaintiff Mullens argues that he is currently a resident of the District and, therefore, the Court should issue an Order declaring that he is eligible to vote in District elections. To support his argument, Mr.

Mullen states that he registered to vote with the Hamilton County Board of Elections in 1979, claiming his Speculator home, which is located in the District, as his legal residence for voting purposes. *See* Affidavit of John Mullens, sworn to June 12, 2001 ("Mullens Aff."), at ¶ 6. Mr. Mullens has voted in federal, state, and local elections in Hamilton County continuously since he registered in 1979. *See id.* at ¶ 9. Moreover, he has never been registered to vote in Saratoga County or claimed that his Clifton Park house was his permanent or legal residence for voting purposes. *See id.* at ¶ 7.

In addition, Mr. Mullens owns two handguns, which are registered in Albany County and are maintained and kept in Speculator. *See id.* at ¶ 24. Although he has filed state and federal income tax returns for the tax years 1995 through 2000, which list his address as "3 Nutmeg Ct., Clifton Park, New York," these returns do not list a "permanent home address" and he was not aware that he was required to list a "permanent home address" separate and apart from the mailing address contained on the tax returns. *See id.* at ¶ 25. Again, although Mr. Mullens admits that he took his STAR exemption on his Clifton Park residence, he contends that he understands the law to be that it does not matter where he takes the exemption as long as he only takes it on one residence. *See id.* at ¶ 30.

Furthermore, Mr. Mullens asserts that he has always considered his Clifton Park house as his office/business property and

---

davit ballot was the absentee ballot application itself, which stated that Mr. Mullens resided in Clifton Partk, the STAR exemption he took in Clifton Park, and the personal observations of Mrs. Morrison who, in addition to being a member of the Board of Registration, was a neighbor of Mr. Mullen in Lake Pleasant.

8. In response to Defendants' motion for summary judgment, each Plaintiff submitted an affidavit setting forth, among other things, information that they contend demonstrates that they were residents of the District in 1999. However, they do not assert that the Board of Registration possessed all of this information at the time it determined that they were not qualified to vote in the District.

has used this property primarily for conducting his personal and professional business. *See id.* at ¶ 37. He explains that this is why he files his tax returns using that mailing address, has a home office in Clifton Park, has his business cards as a salesman list his Clifton Park address, and has his automobile insurance policy list his mailing address as Clifton Park. *See id.* In addition, he claims that Clifton Park has easy access to major highways and the Albany airport, which makes it a convenient place for him as a salesman. *See id.*

Finally, Mr. Mullens asserts that as further evidence that Speculator is his permanent home, when his son passed away in 1996, he buried him in the Speculator cemetery and he and his wife already own plots next to his son's. *See id.* at ¶ 38.

Defendants have come forward with convincing evidence to support their conclusion that none of the Plaintiffs were residents of the District in May or June 1999 and that Plaintiff Mullens is still not a resident of the District. However, Plaintiffs have responded with evidence that would support a finding that they were residents of the District during the relevant period. Although the weight of the evidence would appear to favor Defendants' position, the Court, at this stage of the litigation, may not weigh the evidence. Rather, the Court must view the evidence in the light most favorable to Plaintiffs. Having done so, the Court finds that it cannot determine, as a matter of law, whether Plaintiffs were or were not resi-

dents of the District during the relevant period. Accordingly, the Court denies both Defendants' motion for summary judgment and Plaintiffs' cross-motion for partial summary judgment.

### D.  Discriminatory intent

■ Alternatively, Defendants assert that even if the Court were to conclude that Plaintiffs were residents of the District during the relevant period, Defendants are still entitled to summary judgment because Plaintiffs can offer no evidence of discriminatory intent.

■ It is well-established, at least under New York Election Law, that "a § 1983 action to remedy errors in the election process allegedly violating the equal protection clause does not exist unless the state action constituted ' "intentional or purposeful discrimination." ' " *Gold v. Feinberg*, 101 F.3d 796, 800 (2d Cir.1996) (quoting [*Powell v. Power*, 436 F.2d 84,] 88 [ (2d Cir.1970) ] (quoting *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944)))[9] Moreover, the Second Circuit has "held that the due process clause 'offer[s] no guarantee against errors in the administration of an election,' at least where state law provides a fair and adequate method for correcting such errors." *Id.* (quotation omitted).

Recently, the Second Circuit once again addressed claims of equal protection and due process violations in the context of an election. *See Gelb v. Bd. of Elections of City of N.Y.*, 224 F.3d 149 (2d Cir.2000).

---

9.  As Judge Kaufman explained in *Powell*,
> Were we to embrace plaintiffs' theory [that willful or knowing conduct is not required to state a claim under § 1983], this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and fed-

eral law. Absent a clear and unambiguous mandate from Congress, we are not inclined to undertake such a wholesale expansion of our jurisdiction into an area which, with certain narrow and well defined exceptions, has been in the exclusive cognizance of the state courts.
> *Powell*, 436 F.2d at 86 (footnote omitted) (quoted in *Gold*, 101 F.3d at 800).

In *Gelb,* an unsuccessful write-in candidate for borough president brought a § 1983 action against election officials, alleging violations of his right to due process and equal protection resulting from the board of elections' write-in candidacy voting procedures. At issue was the board of elections' interpretation of § 6–164 of New York Election Law, which appeared to be contrary to the interpretation of the same statute by the New York State Board of Elections and the Attorney General. The court noted that "[i]n light of the repeated refusals of the City Board to afford [the plaintiff] (and others) write-in voting privileges in primary elections, it may well be that the Board engaged in arbitrary, purposeful and intentional discrimination." *Id.* at 157. The court went on to note that "[t]his does not appear to be a case of mere 'unintended irregularities.' " *Id.* (quoting *Gold,* 101 F.3d at 800). The court further stated that it did not foreclose the eventual possibility of summary judgment in favor of the defendants, noting, however, that "summary judgment is generally inappropriate where questions of intent and state of mind are implicated." *Id.* (citations omitted).[10]

In the present case, Defendants claim that Plaintiffs have not produced a shred of evidence to support their claim that Defendants selectively challenged and investigated voters based upon how Defendants believed those individuals might vote in regard to the issue of a new school. Although Defendants acknowledge that the need for a new school was widely-debated, they point to the fact that only Leslie Borland and Robert Dill had letters to the editor published which opposed the new school referendum.

Alternatively, Defendants assert that even if Plaintiffs could offer enough evidence to prove that Defendants knew how Plaintiffs would vote, Plaintiffs cannot offer the Court any evidence that they were singled out because Defendants believed Plaintiffs would vote against the new school referendum. In this regard, Defendants note that there is evidence that at least two individuals, who professed that they would vote for the new school, but who were nonresidents, were not allowed to vote.

With respect to Plaintiffs' claims that the "investigation" Defendants performed was inappropriate and somehow evidence of intent to discriminate, Defendants contend that their actions relative to Plaintiffs were not only in accordance with the Education Law but were arguably required by the Education Law. Defendants note that the Board of Registration has a statutory obligation to ensure that each voter in District elections is a qualified voter. *See* N.Y. Educ. Law §§ 2012, 2014 (McKinney 2000). To meet this obligation, the Chairperson of the Board of Registration, Bobbie Lynne Hoover, based upon her belief that the term "primary residence" as used in the STAR exemption program was substantially similar to the residency requirement under the Education Law, sought the input of Superintendent Brewer on whether the Board of Registration could use an individual's designation of his "primary residence" for purposes of his STAR ex-

---

10. The Second Circuit certified the following question to the New York Court of Appeals: "Is write-in voting available to an enrolled party voter in a contested primary election where no timely petition for opportunity to ballot has been filed?" *Gelb,* 224 F.3d at 158. After the defendants conceded in the Court of Appeals that the certified question should be answered in the affirmative, the Court of Appeals rejected the question, and the Second Circuit remanded the case to the district court to determine whether the defendants had engaged in " ' "intentional or purposeful discrimination." ' " *Gelb v. Bd. of Elections of City of N.Y.,* No. 99–9369, 2001 WL 327113, *1 (2d Cir. Apr.4, 2001) (quotation omitted).

emption to make determinations on residency under the Education Law.[11]

In April 1999, Superintendent Brewer contacted the District's counsel and Dr. Geoffrey Davis, District Superintendent of the Hamilton–Fulton–Montgomery Counties Board of Cooperative Educational Services. Dr. Davis wrote to the State Education Department's Counsel's office to request its opinion as to (1) the language used in District brochures to describe "residence," an issue raised by the Lake Pleasant Sacandaga Association ("LPSA"); and (2) the effect, if any, of maintaining a STAR exemption on property outside the District. Although the State Education Department's Counsel's office did not provide Dr. Davis with a written response, a member of that office expressed to Dr. Davis that the State Education Department's position was that STAR, in fact, is a determinant of residence. Dr. Davis reported this information by a faxed memo dated April 30, 1999, to Superintendent Brewer and to Plaintiff Leslie Borland, who had made a similar inquiry.

Superintendent Brewer shared the information with Hoover, among others. Based upon this information, when Hoover was faced with an absentee ballot application from someone she or another Board of Registration member suspected, or had knowledge, was not a resident of the District and owned a home outside the District, she typically attempted to obtain that person's STAR application or to telephone the appropriate County assessor to determine whether that person had a STAR exemption outside the District. Plaintiffs, as well as others who attempted to vote in May or June 1999, had their qualifications to vote questioned, challenged or rejected. Defendants assert that although the STAR applications were not the only evidence that the Board of Registration considered, these applications were given significant weight relative to other documents for several reasons: (1) a number of people arrived to vote on May 18, 1999, with drivers' licenses obtained that very same day, (2) the County Board of Elections' list was known to be unreliable, and (3) unlike drivers' licenses, pistol permits, and car registrations, to obtain a STAR exemption a person had to specifically certify that the subject property was their primary residence.

In response, Plaintiffs assert that they have submitted extensive evidence, largely found in depositions of Defendants themselves and the documents Defendants have produced, demonstrating that there is a triable issue of fact with respect to whether Defendants intentionally and purposefully deprived Plaintiffs of their right to vote in District elections in violation of Plaintiffs' rights to equal protection and due process of law. *See* Plaintiffs' Memorandum of Law at 8. Moreover, Plaintiffs contend that there are inconsistencies between (1) Defendants' testimony and their documents, (2) the testimony of various Defendants, (3) the testimony of Plaintiffs' and Defendants' witnesses, and (4) the testimony of non-party witnesses and Defendants' witnesses, all of which create credibility issues that must be resolved by the trier of fact. *See id.* Plaintiffs also claim that there is sufficient evidence from which a trier of fact could find that Defendants engaged in a highly targeted and selective campaign to take away Plaintiffs' right to vote in violation of the law and that Defen-

---

11. According to the New York State Board of Real Property Services, *School Tax Relief [STAR] Exemption Assessor's Guide,* 7 (2001), the term "primary residence" equates "with 'domicile' or 'legal residence.' A person may have one or more residences, but can have only one 'primary residence.' "

dants knew when they were depriving Plaintiffs of their right to vote that their actions were in violation of the law. *See id.* at 9.

To support their argument that Defendants intentionally and purposefully discriminated against Plaintiffs and deprived them of their right to vote in the District, Plaintiffs point to the following evidence. All of the Plaintiffs were at one time on the list of registered voters in the District. The Dills and John Mullens were removed from the District's voter registration list as of May 28, 1999. The Borlands voted without challenge or objection on May 18, 1999 and, therefore, must have been on the list of registered voters in the. District. Subsequently, the Borlands were removed from the District's list of registered voters. According to Plaintiffs, the fact that each of them was at one time on the District's list of registered voters undermines Defendants' position that the members of the Board of Registration, based upon their personal knowledge, knew that Plaintiffs were not residents of the District.

Plaintiffs also note that it is undisputed that Robert and Susan Dill have been registered to vote with the Hamilton County Board of Elections since 1975 and Lauren Dill has been registered to vote with the Hamilton County Board of Elections since she was eighteen. Moreover, John Mullens has been registered to vote with the Hamilton County Board of Elections since 1979. Finally, the Borlands were registered to vote with the Hamilton County Board of Elections as of March 3, 1999. Plaintiffs contend that under Education Law § 2014 any person who is registered to vote with the County Board of Elections is not required to register with the District in order to vote in District elections. Plaintiffs claim that Defendants knew that Plaintiffs were registered with the County Board of Elections and that Defendants

knew that, therefore, Plaintiffs did not have to register with the District. Plaintiffs state that this standard is set forth in the Training Manual that the District Attorney provided to the Board of Registration and the Elections Inspectors in August 1998 and that the same standard was set forth in the legal notices that the District published with respect to all District elections since May 18, 1999. *See id.*

Plaintiffs also contend that Defendants' assertion that they only investigated the residency of individuals with addresses listed on the County Board of Elections' list of registered voters outside the District or who submitted an absentee ballot application with an address outside the district is unsupportable. Plaintiffs point to the fact that the Dills and the Borlands were on the April 30, 1999 County Board of Elections' list. Moreover, although both their residences and mailing addresses are in the District, the Chairperson of the Board of Registration requested copies of their STAR application from outside the District just as she did with several other people who did not meet the criteria she used for conducting investigations. Similarly, Plaintiffs assert that there are many people on the County Board of Elections' list dated April 30, 1999, who show a residence or mailing address outside the District for whom the Board of Registration did not conduct any residency investigation or investigate whether they took a STAR property tax exemption outside the District.

Furthermore, Plaintiffs point to the fact that Ms. Hoover admitted that she used a test for determining residence that was based on a physical presence as an inhabitant within the District combined with an intent to make their house within the District a fixed and permanent home. Nevertheless, she and other members of the Board of Registration admitted that they

conducted no investigation and had made no inquiry of the Dills, the Borlands, or John Mullens with respect to their intent to make their houses within the District their permanent homes.

Plaintiffs also dispute Defendants' contention that they were concerned about unqualified voters in the District and that they believed that the certification of "primary residence" under the newly enacted STAR property tax exemption application would provide reliable evidence of intent. Plaintiffs assert that it is difficult to rationalize that proposition with the evidence when Defendants only sought and obtained STAR information for less than twenty people. The County Board of Elections' list of registered voters and requests for absentee ballots demonstrated that many more than twenty people had another place to live outside the District, but the Board of Registration did not obtain STAR information about those people.

In addition, Plaintiffs assert that there is evidence that Defendants knew that Plaintiffs were opposed to the proposition to build a new school. First, Plaintiffs point to the fact that the Dills and the Borlands had Letters to the Editors published in the *Hamilton County News* opposing the proposition. Moreover, Plaintiffs were all members of the Lake Pleasant Sacandaga Association ("LPSA"), which Defendants knew was opposed to the proposition. Plaintiffs also point to the fact that many LPSA Member Alerts and other non-published documents found their way into District files even though no person associated with the District was a member of the LPSA. These publications encouraged LPSA members to register to vote in Hamilton County and to vote against the new school referendum in June 1999.

Plaintiffs also point to the fact that members of the Board of Registration knew that the County Board of Elections

had rejected their challenges to the voter registration of John Mullens and others based solely on their having a STAR exemption outside Hamilton County on or before the May 18, 1999 vote. Moreover, Defendants knew that the County Board of Elections had rejected the challenges based upon STAR because the term "primary residence" under STAR was ambiguous and did not disqualify that person from voting some place other than where they had their STAR property tax exemption.

Furthermore, Plaintiffs contend that one of the most damaging pieces of evidence of Defendants' intentional and purposeful deprivation of Plaintiffs' right to vote is the different treatment afforded Harold and Jocelyn Jerry compared to Plaintiffs. On May 18, 1999, the Jerrys' right to vote was challenged. The challenge was later rejected and/or the Jerrys were reinstated to the list of voters in the District based upon Ms. Hoover's knowledge that the Jerrys rented property in Albany to facilitate Mrs. Jerry's employment as a school teacher at Bethlehem Central High School. According to Ms. Hoover, when Mrs. Jerry was not teaching, the Jerrys spent their time at their property in Lake Pleasant and, in her opinion, because the Jerrys spent all their non-work related time at their house in Lake Pleasant and had been registered to vote in Lake Pleasant and had voted in Lake Pleasant in federal, state, and local elections, she considered their legal residence to be Lake Pleasant.

Plaintiffs contend that it is impossible to reconcile the Board of Registration's treatment of the Jerrys with its treatment of Plaintiffs without finding evidence of intentional and purposeful discrimination because the Dills and John Mullens had exactly the same circumstances: they had been registered with the Hamilton County Board of Elections for more than twenty years and had voted in Hamilton County

for all those years, and they had maintained a second property outside the District principally related to business and employment activities. Although the Borlands' situation is somewhat different, since they affirmatively changed their legal residence in February or March 1999, their situation is no less compelling than the Dills and John Mullens when compared with the Jerrys.

Finally, Plaintiffs point to the circumstances surrounding Anita Desrochers' challenge of the Dills' right to vote on May 18, 1999, and Barbara Schoonmaker's challenge of Mr. Borland's right to vote on June 2, 1999, to suggest that Defendants' conduct was intentional and purposeful. Defendants admit that the Board of Registration created a list of challenged voters who were not qualified to vote at the June 2, 1999 referendum and that the list was provided to the Elections Inspectors working on June 2, 1999. Ms. Desrochers was provided with a list of people who had STAR exemptions in other counties as a basis for challenging people. Similarly, Ms. Schoonmaker testified that on June 2, 1999, she volunteered to help with the vote on the new school. She was asked to challenge anyone about whom she thought there might be some question as to their right to vote. Although she was not given a list of people to challenge, a list of people who were registered for STAR exemptions outside the District was provided. In addition, school employees had instructed her that people who had STAR exemptions outside the District could not vote in the District. The only person challenged on June 2, 1999, was Mr. Borland. In sum, Plaintiffs assert that they have demonstrated a pattern of omissions and violations of law by Defendants that were targeted at Plaintiffs and a small group of other voters but not applied to the majority of voters in the District.

As noted, the Court has concluded that there is an issue of fact as to whether Plaintiffs were residents of the District during the relevant period, thus, precluding summary judgment. However, even if the Court had determined that Plaintiffs were residents of the District, the Court would not have been able to grant Defendants' motion for summary judgment because Plaintiffs have come forward with sufficient evidence to create an issue of fact as to whether Defendants intentionally discriminated against them in applying the criteria upon which Defendants relied to determine which individuals were residents of the District. Accordingly, the Court finds that summary judgment is inappropriate on this ground as well.

## IV. CONCLUSION

After carefully reviewing the file in this matter, the parties' submissions and oral arguments, and the applicable law, and for the reasons stated herein and at oral argument, the Court hereby

**ORDERS** that Defendants' motion for summary judgment with respect to the second and third causes of action of Plaintiffs Robert Dill, Susan Dill, Lauren Dill, Leslie Borland, Jr., and Judith Borland is **GRANTED;** and the Court further

**ORDERS** that Defendants' motion for summary judgment with respect to the second and third causes of action of Plaintiff John Mullens is **DENIED;** and the Court further

**ORDERS** that Defendants' motion for summary judgment with respect to Plaintiffs' first cause of action is **DENIED;** and the Court further

**ORDERS** that Plaintiffs' motion for partial summary judgment is **DENIED;** and the Court further

**ORDERS** that Plaintiffs' counsel is to initiate a telephone conference with the

Court and opposing counsel on June 18, 2002 at 9:00 a.m. for the purpose of scheduling a date for the trial of this action.

**IT IS SO ORDERED.**